**TUCSON ECUMENICAL COUNCIL, Plaintiff,**

v.

**Harold EZELL, et al., Defendants.**

**No. CIV 88–127 TUC WDB.**

United States District Court,
D. Arizona.

Jan. 19, 1989.

Motion to Amend Order Granted
Feb. 7, 1989.

Kenneth K. Graham, Law Office of William Risner, and Nancy Grey Postero, Keller & Postero, Tucson, Ariz., for plaintiff.

John S. Leonardo, Asst. U.S. Atty., Office of the U.S. Atty., Tucson, Ariz., for defendants.

ORDER

WILLIAM D. BROWNING, District Judge.

This is an action by the Tucson Ecumenical Council, owner of a 1982 Dodge Aries vehicle, to recover from the Immigration and Naturalization Service (I.N.S.) said vehicle. The unresolved issues in the case were tried on August 29, 1988.

The vehicle was driven by David Kennon, a member of plaintiff group and a Christian minister. The vehicle contained a companion of his and three other persons, a woman and her two children. It is undisputed that the latter were citizens of Guatemala and did not have prior or proper documentation to be in this country and that the foregoing was known to Kennon and his companion, both U.S. citizens.

On June 15, 1987, the date of the seizure, a rancher notified government agents that a van and its occupants were parked on a dirt road near the United States–Mexico border, in what the government knew to be a well-used drug smuggling area. En route to this location, border patrol agents spotted a van matching the rancher's description. The van was stopped and the alien occupants detained.

Later, the agents were able to ascertain, by tracing tracks, that the aliens had been escorted from a point near the border to the parked van.

Kennon testified that the aliens had asked his organization for assistance several days prior to June 15th. They claimed to fear for their lives in Guatemala. The woman had lived in Los Angeles, California (without documentation) and had returned to Guatemala with a terminally ill daughter who wanted to die in her native land. After the daughter's death, the woman and two children made their way back to the U.S. border where they contacted plaintiff group.

Kennon testified he knew they lacked proper documentation. He testified his group didn't help them cross the border but that, once across, he intended to transport them to Tucson, Arizona, where they had an appointment with an attorney at 3:00 p.m. the following day, June 16th. Kennon testified that he felt the aliens would be rejected if they tried to get proper entry papers at the Douglas—or any other—border point of entry, but that if they presented themselves to an inland office of the Immigration and Naturalization Service, such as Tucson or Phoenix, they would be allowed to remain in the United States pending action on their application for legal status.

Erika Kreider, a lawyer devoting a substantial amount of time to immigration matters, was the attorney with whom the aliens had the appointment. She testified that they could have presented themselves to the border port of entry, where an INS officer, in his or her discretion, could admit or exclude the alien, detain the alien, or parole the alien into the United States.

These aliens could have presented themselves to a U.S. Consulate in Mexico, or the ports of entry at Douglas, Arizona, or Nogales, Arizona. They could have counseled with Attorney Kreider by phone or mail or by personally meeting with her, or other counsel, at the border.

On June 15th, the day of the seizure of the van, Kennon authored a letter to the District Director of the Immigration and Naturalization Service in Phoenix, Arizona. He mailed said letter from Tucson to Phoenix by certified mail on the same day. Kennon's testimony was that he had knowledge of the plans to assist these aliens on or about June 8.

The letter stated the nationality and number of the aliens, but refused to disclose their identity, date of entry or the like. It said, in part, that Kennon's group "is helping the . . . refugees reach legal counsel in order to determine the best way for them to *obtain legal status* in the United States" (emphasis added).

The aliens themselves each carried letters (in English and in Spanish) furnished them by plaintiff, stating, in relevant part,

> The office of the Immigration and Naturalization District Director for Arizona *has been* notified that I am on my way to seek legal counsel in order to determine the best way for me to *obtain legal status* in the United States (emphasis added).

It also gave the name, birthdate and "country of origin" of the bearer and stated no other information would be furnished without "my attorney" being consulted and present.

Additional facts and contentions will be presented below.

The law provides that any conveyance used in violation of 8 U.S.C.A. § 1324(a) may be seized and forfeited. Title 8 U.S.C.A. § 1324(a) provides, in relevant part, that "[a]ny

> person who knowing or in reckless disregard of the fact that an alien [is] . . . in the United States in violation of law, transports, or moves [the] . . . alien within in the United States by means of trans-

portation or otherwise, in furtherance of such violation of law

is guilty of a criminal offense. 8 U.S.C.A. § 1324(a)(1)(B) (West Supp.1988).

Plaintiff claims that Kennon had a good faith belief that he was not acting in furtherance of a violation of the law. Kennon bottoms his good faith belief on the following:

1. An affidavit by one Jesus Romo, an investigator for a law firm, made in behalf of that firm's client, a defendant in the 1985 "Sanctuary" trial held in the U.S. District Court in Tucson, Arizona (CR 85–008); [1]

2. An April, 1985, tract by A. Bates Butler III, justifying violation of the government's interpretation of the immigration laws;

3. His choosing "moral and humanitarian" law as having greater force than the government's interpretation of the immigration laws;

4. A speech by one Karen Parker (whom he described as "a legal expert") at a seminar;

5. His own, but unspecified, extensive study and research;

6. The Refugee Act of 1980 (8 U.S.C.A. § 1151 et seq. (West Supp.1988)).

The Court must weigh the reasonableness of his beliefs, and whether they are held in good faith, against all the circumstances of plaintiff's actions in the case.

The Romo affidavit, based in large part on hearsay, criticizes the Immigration and Naturalization Service for deporting aliens they determine are ineligible for entry. It contains other hearsay saying that I.N.S. policy is to inform a person requesting asylum to make application at the nearest U.S. Consulate in Mexico. It further states (also hearsay) that no "refugee" had ever asked for asylum at the Nogales port of entry. The Court finds that a reasonable person could not formulate a good faith belief based on this affidavit, either standing alone or in conjunction with the other items noted above. None of the conclusions in this affidavit would confer legal status on an undocumented alien.

The Butler tract contains historical and religious analyses justifying "civil disobedience" (his words) of the immigration laws. He refers to the government's policies of law interpretation and enforcement as "biased" and "perverted" while clearly acknowledging that it is well known that conduct such as Kennon's here is unlawful in the eyes of the government. He eloquently documents his disagreement with the law, but his opinion cannot form a basis for a good faith belief in the legal status of the aliens in this case. Indeed, a good faith belief that undocumented aliens were nonetheless entitled to be in the United States as political refugees under the Refugee Act of 1980 is no defense to a charge under 8 U.S.C. § 1324. *United States v. Merkt,* 764 F.2d 266 (5th Cir.1985).

Kennon's belief of "humanitarian and moral" law as vitiating an act of Congress, and his reliance on a speech by someone named Karen Parker (which was neither introduced into evidence nor addressed in the briefing), as well as his own undisclosed extensive study and research cannot, and do not, constitute a good faith belief in the legal status of these aliens.

The Refugee Act of 1980 provides clear procedures whereby persons can gain asylum or legal temporary entry into the United States. 8 U.S.C.A. § 1158 (West Supp. 1988) (Asylum Procedures); 8 U.S.C.A. § 1157 (West Supp.1988) (Refugee Admission). The legislative history clearly shows its purposes to be humanitarian, and that it was enacted to remove impediments to those deserving of entry. Kennon and others involved here took every step possible to avoid invoking the procedures and protection of the Act because they believed it to be poorly administered or unwisely interpreted.

Plaintiff urges that these aliens were lawfully entitled to presence in the United

---

1. The defendants in this trial were found guilty and the conviction is on appeal to the 9th Circuit Court of Appeals.

States because of "other law," which is defined variously as humanitarian law, international law, customary law, treaty law and the like. However, the drafters of the Refugee Act of 1980 considered all of these other laws and defined the policy of the United States, after deliberation, in that Act. S.Rep. No. 96–256, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Admin.News 141.

Plaintiff also claims Kennon operated under a "mistake of law" in that he believed that international law legalized the status of these aliens. As pointed out below, the facts belie that he operated under any such mistake of law or fact, thus making it unnecessary to reach the question of whether it would constitute a defense here. See, e.g., *United States v. Merkt*, supra; *United States v. Fierros*, 692 F.2d 1291 (9th Cir.1982), *cert. denied* 462 U.S. 1120, 103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983).

Focusing on the specific facts present here, it is unmistakably clear that Kennon acted with the scienter necessary to support forfeiture pursuant to 8 U.S.C. § 1324. That Kennon acted as a matter of conscience and moral conviction and with no intent to do specific harm to any person, group or society is abundantly clear to the Court, but that does not mean he did not know he was violating the law. It only means that in following the dictates of his conscience he was willing to violate secular law in order to obey moral law. With the freedom to make that choice, as I believe he did, comes the consequences of the act demanded by that secular law. In this case that is forfeiture.

Kennon's intent is very clear. He knew that he needed some protection from secular authority and hence sent the letter to the District Director. He knew that this was a mere subterfuge and an empty act for his planned operation would have been completed before the District Director received it. He also knew these aliens did not have legal status, as indicated by the furtive nature of arranging their entry and transportation. The letter itself acknowledges he knew their presence was illegal for his claim was to explore legal status.

If their presence was legal such would be unnecessary.

It may appear strained to hold that Kennon's phraseology should be construed as an admission that the aliens' status was illegal. But Kennon chose the words, chose to employ the ruse of giving notice of his intentions to the government. He cannot therefore complain if his words are construed literally as an expression of his knowledge and, inferentially, his intent.

Further, Kennon knew that the Immigration and Naturalization Service rejected all of his theories concerning the legality of presence by aliens such as these and knew that a court of law in a widely publicized "Sanctuary" trial in Tucson had rejected these arguments, the Bates Butler position, as well as other well-briefed, ably argued positions.

Testimony at the trial also cast serious doubt on the claimed well-founded fear of persecution, and therefore, Kennon's reliance on such. The adult Guatemalan, Kennon testified, was illegally in this country for approximately two years, in Los Angeles, before leaving to return to Guatemala with her terminally ill daughter. Sometime after the death of her daughter she made her way back through Mexico to the United States border near Douglas, Arizona. A reasonable person would be led to a legitimate inquiry as to why, given her alleged fears, she made no request for asylum or other legal status in this country during her prior lengthy stay. The Court feels that any reasonable person would conclude, given her prior stay here, that had Attorney Kreider advised her that she could not "obtain legal status" she would have remained in the United States nonetheless, and that Kennon transported her knowing this or in reckless disregard of it.

Kennon's motives were pure, but his acts reveal the guilty knowledge required for a violation of 8 U.S.C. § 1324. He is not free to place himself above the law though he is free to choose civil disobedience if he is willing to accept the consequence of his choice. It is inescapably clear that this is what he did. An ordered society, with free-

dom to participate in the forging of its laws, demands accountability.

The Court therefore finds that the seizure was properly made and that plaintiff's complaint asking for a return of the vehicle is without merit. Judgment may therefore be entered in favor of the defendants.

### ON MOTION TO AMEND ORDER

It is the finding of the Court that the actions of Mr. Kennon and his associate were in furtherance of the aliens' illegal presence in this country.

IT IS THEREFORE ORDERED that the motion of the plaintiff to amend the order is hereby GRANTED.